Good morning, Your Honors. John Fairbrook on behalf of Appellants. This case comes to Your Honors following the granting of a motion for summary judgment. The district court ruled that there was no potential for coverage on the facts submitted, and it reasoned based on three separate bases the court found, and I wish to discuss those briefly. I'd like to start with the business pursuits exception to the policy. And the question here, I think, is whether or not there was sufficient evidence which would sustain a jury had it been submitted that, in fact, Joseph Aggio's leasing of the gun club was not motivated by a profit motive. And the cases that we have cited are clear in establishing that it is the intent. It's not the receipt of income. It's not the receipt of money. And it's not whether the business makes a profit or a loss, but it is an analysis that goes to the mental intent and motivation for entering into the, in this case, a lease. And your argument is that's a quintessential issue for a jury or for a fact finder, and there's enough to survive summary judgment? Yes. In fact, I think it's not only enough to survive summary judgment. I think it's compelling. The evidence is for the first 10 years that the lease existed, not a single dime in rent was paid. Certainly, there's no profit motive. A jury couldn't conclude during that period of time there was any profit motive. And thereafter, we have to look at the evidence and say, well, what evidence is there that would have changed Joseph Aggio's intent from voluntarily leasing this with no money to a profit motive? And the evidence simply doesn't exist. The evidence is that to the extent rents were paid, it was voluntarily paid by the gum club, almost at their insistence, without any negotiation or effort to arrive at a market rent or any seemingly concern by Joseph Aggio. How long did this relationship exist? How many years? Over 30 years, Your Honor. Excuse me. Over 30 years, Your Honor. How much money did he make off of it, assuming he made money off of it? I've never added it up, but it was relatively nominal, starting at $50 a month and I think at the height. There's no market analysis. And there was a below market rate? Well, I think there's certainly enough evidence to infer that, given the way that this was established and the fact that the motivation for the gum club in paying it wasn't to try to establish market rent. It was simply we have more people now, it's a nonprofit corporation, and we're going to give you some money. And Mr. Aggio, to the extent there's any testimony, said, well, that's good, because maybe that will motivate them to keep the property up. Why doesn't the other exception apply here? All right. The owned property. The owned property. I'd like to hear about the property exception. Yes, Your Honor. The owned property exception certainly would apply to damage to the property itself. Numerous cases which we have cited establish that to the extent that the efforts of the eminent threat, though, does it not? Yes, it does, Your Honor. Not an imminent threat. It has to be an actual contamination with a threat of contamination. Now, that's not necessarily an imminent threat. I don't see that in the cases. But there is some evidence that you can't have a speculative concern. The case that the Respondent cites is the Titan case. Now, the Titan case is distinguishable in a very particular and important way. In that case, there was a pollution exclusion. And there they had TCEs of other contaminants which fell within that exclusion. And so even if there was a potential for migration to the groundwater or transportation to an off-site, it didn't matter. There was no coverage in that case, because all of those contaminants were covered under the pollution exclusion. We have no pollution exclusion in this case. And we have the goals listed in the Remedial Action Work Plan that specifically and clearly identify that three of the goals were to ensure that there is no transportation of the lead. There were three separate paths which are discussed for the transmission of this lead. And while it was at the present time, it had not yet affected it, it was certainly required as a means of preventing the future home. The Remedial Action Work Plan, which I believe the jury could certainly properly consider, identifies the goals as to prevent migration of lead from contaminated soils to the water and sediment of unnamed drainage ditch. I don't think there's any argument that that does not fall within the property owned exclusion. You're after the cost of remediation. Is that what it is? Yes, Your Honor. How are those damages in the traditional sense? Because, quote, you did it to yourselves. You cleaned it up. And so you incurred these expenses. That's not damages. Well, if my clients were making a first-party claim under their own insurance policy, I would not quarrel with you. I would perhaps quarrel with the California Supreme Court, which has indicated that that's not damages in a minority sense. And there's a compelling dissent in that case. And I raise that because I don't think there's any indication that the California Supreme Court would extend that ruling beyond its literal application, which is here a first-party settlement with its own insurer. What we have in this case is, in fact, a lawsuit brought by my clients, and we seek to compel, obtain a court order compelling Joseph Azzio to pay. That is not a voluntary action. It is a suit for damages as defined in the Foster Gardner case. And so I think that we have established both damages. Don't you have to look at the underlying harm, though? Well, you do. To determine whether or not there were damages within the meaning of the policy? Well, we have the Vandenberg case that analyzed that and said, yes, you know, we looked at tort, but it was broad enough to include the contractual damages. And we have also the Intel case, which says that you don't really look to the form of the mechanism of how they have to pay it. There are several avenues by which a potentially responsible party can seek contribution or reimbursement from other potentially responsible parties. And so it's an artificial distinction to say that when a party enters into a consent decree or a voluntary cleanup agreement, as we did in this case, that they do that completely voluntarily. There's an under — there's an overarching sort of Damocles, as it were, over that person who — Well, it looked like you — like you entered this voluntary agreement in order to complete a sale, complete the sale of the property. Right. I don't think there's evidence to support that. We did it because we were a potentially responsible party, and the — I thought I read that in one of these reports. In order to complete — we did sell the property. But that the seller, Soiland, is that what it's called? Soiland is the buyer. Right. Yes. Wanted — as part of the sale, wanted the property cleaned up. Certainly. Were you under any compulsion from an external source, such as a governmental agency, to do this? Well, compulsion is — Were you under any orders, administrative? No, no court — no court order or administrative order. Nothing was bearing down upon you from the evil government or something like that? Let me — let me just say this. It looks like you just wanted to sell it, and the buyer said, clean it up, and then we'll buy it. Well, actually, no. We sold it, and the gun club was to clean it up. Right. And then they — then they failed. They crashed. And then that kind of reverted back to my clients, and the government was all over it, saying, it's now your baby, and you have to deal with it. And as these cases say, is that — Well, but there was — in that intervening 4-year period, there was no order from the government to clean it up. There was no order from the government to clean it up. And they were well aware of it by that time. Yes, but there were discussions. And, in fact, if you look at the — the Intel case, there's discussion about that mechanism and — and how that's, in fact, the preferred remedy when you're looking at this, is to have the government work out these consent decrees, and that it's an artificial distinction to say, if we're going to make them sue us — Did any California Supreme Court case support what you just said right there, there's an artificial distinction, and we should just treat it as though these voluntary agreements, just as though the government ordered it? There is a Ninth Circuit decision that I referenced. There's no — there's no, that I'm aware of, California Supreme Court that directly addresses this. And as I mentioned to you earlier, I believe both the foster grant cases and the powering case simply don't do that. What's the dollar cost of the remediation? What are you after? How much — how much money? Close to a million dollars, Your Honor. And what was it sold for, the property? $300,000. $300,000. And with that, I'll reserve any time I have left. You may do so, counsel. We'll hear from the other side. Good morning, Your Honors. Please, the Court. My name is Danielle Arteaga, and I represent Sequoia Insurance Company in their capacity as the insurer for the estate of Joseph Baggio. I'd like to start by talking to you first about the owned property exclusion, if I may. The exclusion in the Sequoia policy precludes coverage for damage to the insurer's owned property. And as I understand the AGIO's argument, it's that because they remediated contamination on the AGIO property to, in part, prevent damage to neighboring properties or groundwater, that that owned property exclusion shouldn't apply. The difficulty with this argument is that it stretches intel and the related cases beyond what they actually say. Admittedly, there's language in intel which suggests that the bare threat of contamination emanating from a property to another property justifies avoidance of the exclusion. But I think it's important to look at the context in which intel and related cases arose. Intel involved not a theoretical threat of contamination to a third-party property, but concerned actual contamination to third-party property, both to groundwater and to adjacent soil. So it was in that context that the intel court made its comment that the owned property exclusion in a liability policy should not apply to remediation efforts designed to prevent future harm. That future harm isn't to be speculative. It's future harm that's virtually certain to occur. In reaching that holding, the intel court relied on a case called Aerojet. And Aerojet presented the court with a similar set of facts. It involved contamination of both the insurance property, that and contamination that had emanated to third-party properties. And in that case, the court similarly found that the owned property exclusion should not allow the insurance company to avoid indemnifying the cost of remediation efforts for third-party property. In the instant case, there is absolutely no evidence that there was an imminent or significant threat of contamination to a third-party property or to groundwater as a result of the lead deposited on the AGO's property. To the contrary, the expert reports note that groundwater was not expected to be encountered until about 20 to 30 feet below the surface soil on the property. The property was not located adjacent to any surface waters. The property was not putting at risk a significant aquifer. And the excavation at the property was, at the most, the top 15 inches of soil. So neither the presence of lead, which was contained only in that top 15 inches, or the excavation activities themselves represented any risk to adjacent properties or to groundwater. In the absence of such a risk, there really was no triable issue of fact that would have precluded application of the owned property exclusion in the policy as a matter of law. And you're telling us when we go back and look at the record, we'll find absolutely nothing that contradicts what you just said? That's what I'm telling you, Your Honor, yes. Okay. There were three reports, the PEA, the RACR, and the RAW, which, by the way, is not a remedial action plan. It's a removal action plan. But they all said no actual or potential for contamination. They said that the lead in the soil represented an insignificant risk to groundwater because its soluble qualities would not permit it to leach into the soil. What's an insignificant risk? Because the lack of... Is that different from no risk? It is different from no risk, Your Honor, but it's also different from... So there is a risk. It's not no risk. There is a risk. Correct. But it's insignificant. I'm sorry, Your Honor. I don't mean to keep... Well, that's okay. I'm just trying to track this down. I mean, you say there's no. Now we find out there's some risk, but it's insignificant. I'm sorry if I misspoke, Your Honor. My intent was to say to you that there was no evidence in the record of an imminent or substantial threat of contamination emanating from the AGIO property to a third-party property or to groundwater. Moving on to the business pursuits exclusion, the argument here is that because the question is whether or not Joseph AGIO had a profit motive for entering into the lease agreement with the gun club, then that in and of itself should have precluded summary judgment because motive is inherently a factual issue. I can't agree. I can't disagree, rather, with the argument that motive is a factual issue. The disagreement is that there wasn't sufficient evidence before the district court of an undisputed nature to allow the court to make that factual determination on summary judgment. In fact, the district court made the factual determination. District courts don't make factual determinations on summary judgment. I'm sorry. The district court properly determined that the evidence supported only one conclusion, which was that Joseph had a profit motive for entering into the lease agreement. Yeah. What's the evidence of that? It's hard to find. Actually, there is considerable evidence in the record, Your Honor. In the first instance, Joseph entered into written lease agreements with the gun club, and those are found adjacent to the deposition of Marie AGIO in the record.  I agree.  Lease agreements. Furthermore, there are tax records attached to Ms. AGIO's deposition which indicate that Mr. AGIO claimed that rental income on his income taxes as income. The amount of the gun club rent is not segregated from the ranch rent, but from the leases, it can be ascertained that the rent varied from anywhere from in the early years a low amount to later $800, $1,100, and $1,200 per year. Weren't there many, many years where there was no payment of anything? Yes, but my principal concern here today and the concern of the district court below is the period of time between 1985 and 1988 when the Sequoia policies were in effect. So although there may have been a considerable time where Joseph rented the property to the gun club without consideration or with consideration that might be classified as nominal, during the period of time in which the Sequoia policy was in effect and during which we're concerned with whether he was entered into a business pursuit, there were no segregation. So are you saying we are not allowed, we cannot consider anything that happened with respect to his intent prior to the time when the insurance policy went into effect? Yes, Your Honor, that is my position, that the relevant period of time is. So during that relevant time, how much was the rent? It was between $800 and $1,200 annually. Annually? Yes, that's correct. Do we have any evidence in the record of what the market rate was on a monthly basis? There was no evidence in the record, Your Honor, of what fair market rental value for the property. And how many acres were involved here? Approximately 10 were rented to the gun club. I would submit, Your Honor, that the evidence of fair market rental value of the property would have been irrelevant. The test for profit motive is not whether the insured actually achieves a profit. The test for profit motive is whether the insured is engaged in a regular activity with a pecuniary motivation. There is no question that Joseph not only collected rent for the gun club, but was also essentially in the business of renting the entire Augeo property. He rented a portion of the property that was operated as the dairy farm to his sons. He rented a portion of the property to Marv Soyland for his use as the rock quarry. And these rents were virtually Joseph Soyl's source of income. Counsel, what about the damages issued and the cleanup costs constituting damages? Part of the analysis of the damages issue has to begin with understanding how the estate is even a party to this action in the first place. Under California law, an estate is a non-entity. It's just a name that we assign to a collection of assets and liabilities for ease of reference. Pardon me. So consequently, an estate cannot be sued or sue. An exception to this rule has been created by California Probate Code Section 550, which allows a claimant to maintain a suit against a decedent's insurer, basically, by naming the estate as a party to the lawsuit. So in that one sense, this is not really a suit against an insurer. Joseph Adgio is not a party to this action. Really, Sequoia Insurance Company is the party to this action by virtue of Probate Code Section 550. What that section does is create basically a legal fiction that allows a claimant to reach the sole remaining asset of a long-closed estate. Additionally, the Adgios inherited the property that's the subject of the underlying CERCLA action. They had the option to not accept that inheritance, particularly when they accepted it with an awareness of the environmental condition which it was in. Having done that and then compounded it by voluntarily assuming an obligation to remediate the property, they have put themselves in the position of being unable to show the loss or detriment that's required under AIU and Powering to establish damages as that term has been judicially construed to meet in a liability insurance policy. The voluntary nature of the ascension of the cleanup costs precludes that from ultimately being loss or detriment, even though ultimately this lawsuit will result in money ordered by a court. Interestingly, because the estate is a non-entity, any judgment that might be rendered in the underlying action is going to have to be against Sequoia. To have a judgment in the name of the estate would be virtually meaningless. From whom are you going to collect that? The estate is not an entity and it's long since been closed. It's 20 years closed at this point. Roberts. Counsel, anything further? No, Your Honor. I've submitted. Thank you. Mr. Fairbrook, you have some reserved time. First, let me just complement the my statement. Your Honor, it asked me if I was aware of any California supreme court authority with respect to the question of whether cleanup costs are damages. And my answer, no. There is a case or two cases that I think bear on this. One is the AIU Insurance Company v. Superior Court. Now, that's a California case. Are we getting new cases now that are in the briefs? No, no, no. They're in the briefs. Absolutely. Fully discussed in the brief. All right. The AIU Insurance Company case holds that the cost of reimbursement of costs of cleanup did, in fact, constitute damages regardless of the nature of the cleanup performed or the property interest possessed by the plaintiff. Now, Sequoia makes a distinction that our request is not under, is not technically a response to cleanup because we are making it under this other section, which is a strict liability section. I just refer you again to the Ninth Circuit decision, United States v. Atlantic Research Corporation, which I think complements the AIU case and I think establishes clearly that the, whether you're proceeding under one cause of action under CERCLA against a potentially responsible party for contribution or you're suing under the recognized cause of action under 107A, 4B, I think it is, that they're both causes of action, they're both going to result in an order compelling a cleanup, and they both arise out of the same property damage. And in this case, of course, the court, the district court confirmed that we are talking about property damage. In the last point I would like to make, in Vandenberg v. Superior Court, in dealing with the question of looking at the underlying purpose of the payment or the obligation, I remind the courts, Your Honors, that this is a contract interpretation case and ambiguities in insurance policies are typically resolved against the insurer and in Vandenberg the court noted that a reasonable lay person would certainly understand, quote, legally obligated to pay to refer to any obligation which is binding and enforceable under the law, whether pursuant to contract or tort liability, and I would suggest, Your Honor, that if you include a subsequently enacted statute that imposes on a potentially responsible party cleanup obligations, that that would fall within the ambit of that rather broad iteration of liability. Thank you. Thank you, counsel. The case just argued will be submitted for decision.
judges: O'scannlain, Trott, Paez